# RIGGS v. MUTUAL LIFE INS. CO. OF NEW YORK.
## —172 S. W. (2d) 1017.

Western Section.   January 11, 1943.

Petition for Certiorari denied by Supreme Court, April 3, 1943.

Joseph C. Tainter and Sam S. Margolin, both of Memphis, for appellant.

Fitzhugh, Murrah & Fitzhugh and W. F. Murrah, all of Memphis, for Insurance Co.

KETCHUM, J. By her bill in this case Mrs. Riggs sued to recover certain total and permanent disability benefits alleged to be due her under a life insurance policy issued to her by the defendant on November 10, 1925, and to compel the defendant to re-instate the said total and permanent disability benefits alleged to be due her under said policy. On the hearing the chancellor dismissed her bill and she has appealed.

The policy was for $1,000, and, in addition to the usual life insurance feature, provided also for the payment of a total and permanent disability benefit of $10 per month for the first five years of such disability, $15 per month for the next five years, and $20 thereafter during the continuance of the said total and permanent disability. The terms "total disability" and "permanent disability" are defined in said policy in the following language:

"Total Disability: Disability shall be considered total when there is any impairment of mind or body which continuously renders it impossible for the insured to follow a gainful occupation.

"Permanent Disability: Total disability shall, during its continuance, be presumed to be permanent:

"(a) If such disability is the result of conditions, which render it reasonably certain that such disability will continue during the remaining lifetime of the insured; or,

"(b) If such disability has existed continuously for ninety days."

The policy made no provision for the payment of any benefits for partial disability.

On or about the first day of February, 1938, the complainant suffered an injury in the sacro-iliac, coccyx and sacro lumbar regions, occasioned by child-birth. This caused her great gain and suffering, and upon the necessary proofs being made the defendant recognized this as a total and permanent disability within the meaning of those terms in said policy, and paid her the stipulated benefits of $10 per month from April 30, 1938, to March 30, 1940, a period of two years. At that time the defendant required her to submit to an examination by its medical ·referee, Dr. A. R. McMahan, who, after said

examination, reported that she was no longer totally disabled. Thereupon Mrs. Riggs submitted to the company the reports of four prominent orthopedic surgeons, and roentgenologists of Memphis who had examined her, to wit, Dr. Edwin J. Lipscomb, Dr. Willis C. Campbell, Dr. J. Cash King and Dr. Henry G. Hill. These reports, however, were deemed insufficient, and her application for the reinstatement of the policy was finally denied. Whereupon the bill in this case was filed.

The second assignment of error complains of the action of the chancellor in admitting in evidence over the objection of the complainant, the testimony of the defendant's claim representative, Stephen L. Beach, as to statements made to him, not in her presence, by Dr. Lipscomb, who had treated her for her injury; and by O. P. Wiseman, J. P. Whitley and Boatner Stanley, who were grocers and clerks from whom complainant had purchased goods, and by other persons; all of which statements related to the complainant's physical condition as observed by said persons. This testimony was objected to as hearsay evidence and incompetent because it purported to detail the information which the witness had obtained in his conversations with said persons with reference to the complainant's physical condition. The defendant objected to the testimony of the doctors as to the total disability of the complainant upon the ground that their opinions were based upon the statements of the complainant as to the pain and suffering she had endured when there were no objective symptoms to support her statements. The exceptions to this testimony of the doctors were not preserved in the record. The chancellor admitted all of this testimony, however, giving as his reason that:

"There is comparatively little real dispute, however, about the actual physical situation and condition of complainant, regardless of whether the testimony is excluded or admitted in evidence; and this court, therefore, has reached the conclusion that an equitable decision as to the exceptions to the admission of testimony is to overrule all of same and consider as properly admissible all of the evidence offered by both sides. This policy will also facilitate the making up of the record in this cause in the event of an appeal."

The evidence of the witness Beach was clearly hearsay and inadmissible upon that ground. Exceptions were filed thereto in writing, pointing out the specific evidence complained of, and we think the chancellor erred in admitting it over the objection of the complainant. Wiseman, Scott, Beard, grocers from whom complainant bought her groceries, and Mrs. Thompson and Mrs. Dunlap, neighbors, testified for complainant, and contradicted many of the statements attributed to them by the witness Beach. The statements of Dr. Lipscomb in his letter to Dr. Riggs and furnished to the defendant, differ in material respects from the statements attributed to him by the witness Beach.

For the above reasons the second assignment of error will be sustained and the testimony of Beach relating to his conversations with these several persons, and what they said of complainant's physical condition will be excluded.

The remaining assignments of error, six in number, complain of certain specific findings of fact by the chancellor as being against the great preponderance of evidence. These assignments may be grouped and considered together under the general head that the chan-

cellor erred in finding that the complainant is no longer totally disabled, and that she is now only partially disabled. This was the ultimate conclusion upon which he dismissed the bill. Consideration of these assignments requires a brief review of the evidence.

The fact of total and permanent disability having once been established the presumption is that it continued, and the burden was cast upon the defendant to prove that the condition no longer existed. Beasley v. Pacific Mutual Life Ins. Co., 158 Tenn. 346, 13 S. W. (2d) 330.

Upon proofs that were satisfactory to it the defendant paid the complainant the stipulated allowance for total and permanent disability benefits for two years, from April 30, 1938, to March 30, 1940, inclusive. It then called upon complainant to submit to an examination by Dr. McMahan, its medical referee, which she did. Dr. and Mrs. Riggs say this was a very superficial examination, with no examination whatever of the sacro-iliac, coccyx and sacro-lumbar regions. They say that the examination consisted of weighing her, taking her blood pressure, obtaining a specimen of her urine, and applying some bichlor acetic acid to a mole on her chin, which he thought would remove the noble. Dr. McMahan in his testimony admits that this was the only examination he made. He says

"Q. Doctor, let me recite to you the events supposed to have taken place and that did take place that day you examined Mrs. Riggs;—just want to know anything in addition to that that you did do. You weighed Mrs. Riggs? A. Yes, sir.

"Q. You took her blood pressure? A. Yes.

"Q. Took a specimen of her urine? A. Yes.

"Q. You put medicine on the mole? A. Yes.

"Q. Was there anything else you did in the way of examining Mrs. Riggs that day? A. No, I don't think so,—Began the observation."

There is no evidence of any other examination made, as the basis for discontinuing the payments.

After the defendant indicated that it was going to discontinue the disability payments, the complainant was examined by Dr. Lipscomb, Dr. Willis Campbell and Dr. Henry G. Hill, who were specialists in orthopedic surgery, and Dr. J. Cash King, a specialist in Roentgenology, all of whom made written reports as to her condition, in which they expressed the opinion that she was totally and permanently disabled, and these reports were furnished the defendant in the hope that it would reconsider its action and continue its disability payments. This it declined to do, however, upon the ground that the opinions of said specialists were based altogether upon what the complainant herself said about her pain and suffering and that there were no objective symptoms to confirm her statements.

On the trial of the case, Dr. Lipscomb, who had treated the complainant from the beginning of her trouble, was unable to testify because of a very serious injury he had received in an automobile accident, but in his report he said:

"So far as the extent of Mrs. Riggs' disability is concerned it is only natural to assume that anyone suffering as much pain as she does and having paroxysms of pain to follow the slightest physical effort, is for the time being totally disabled, and the fact that it has existed for so long with little or no change, it would seem to me that the disability is not only indefinite, but probably permanent."

He diagnosed her trouble as "a chronic relaxation of the pelvic joints, especially in the back, that we occassionally see following childbirth." He had previously recommended the use of a metal brace as a rigid support of her back, which, however, had not been as satisfactory as one Dr. Campbell had had made for her, and he recommended that under the circumstances she continue the use of the Campbell brace.

Dr. Campbell has died since his report was made and, therefore, could not testify in the case. His diagnosis of the complainant's trouble was "infectious spondylitis." He recommended conservative treatment at first, such as extension on a Bradford frame, sun treatment, and the application of a sacro-iliac belt such as she was then wearing, with a pad over the sacro-iliac; and as a last resort "a fusion of the sacro-iliac joint."

Dr. J. Cash King, a specialist in Roentgenology, made X-ray pictures of the pelvic region, and said that the pictures showed that the sacro-iliac articulations or joints were abnormal, and showed more relaxation of the sacro-iliac than you generally see after childbirth, and that there was a shortening of the left lower extremity. And he was of opinion that the severe back pains with which the complainant suffered was one of the most constant pains of patients with asymetry of the lower extremities; and he was of opinion that the constant pain which the complainant suffered was due to the asymetry in the lower extremities. He testified that her condition had been most persistent and stubborn, that he could not predict how long it would last, but that she was at that time wholly unable to engage in any gainful occupation. On his cross-examination he said that the X-ray pictures

showed some "arthritic changes in the sacrococcygeal articulation."

Dr. Henry G. Hill testified that the X-rays showed "a mild arthritic condition of the coccyx joint." and a "curvature or deviation of the spine to the left." He said that the X-rays showed "a moderate amount of lapping" in the sacro-iliac joint and a "decided arthritis in the first joint of the coccyx," and "a slight deviation of the lumbar spine and sacrum to the left," and this deformity in the spine would cause or render her susceptible to pain. In answer to a question whether he thought her condition could be cured, he answered that an operation having been advised he thought that should be considered, but he recommended a more conservative treatment—the Bradford frame—first. He testified that she was not a helpless cripple but that she could get about, could drive her automobile for short periods of time, could plan meals, and that people suffering from "low back pains" can do a lot of things, and that the question of whether she was totally disabled depended upon what you consider total disability. But he considered from her statement that she had to wear a brace constantly and rest in bed a substantial part of each day that she could not follow any gainful occupation without suffering a great deal, and that he would not advise her to do that. And he said that the suggested operation, involving the spine, was a major or serious operation. Dr. Hill did not note any shortening of the left leg but observed a tilt in the pelvis due to the curvature of the spine to the left.

Dr. Riggs, the husband of the complainant, testified that during the last two months of his wife's pregnancy she showed signs of premature labor, and that he sent her to the hospital and kept her there for those two

months; that following the birth of the child she complained of intense pain in the rectum and anus, and also in the sacro-iliac region, and that for this trouble he called in Dr. W. W. Walker who had delivered the child, and they thought the pain she suffered might be a referred pain to the back caused by an infection of the cervix, but treatment for this afforded no relief, so he then called in Dr. B. F. Hardin who specialized in diseases of the rectum and anus. Dr. Hardin found no trouble with the rectum and anus, but observed that the coccyx was very tender and painful and advised him to consult Dr. Lipscomb who was an orthopedic surgeon. Dr. Lipscomb made X-rays and observed arthritic changes in the coccyx and a separation of the sacro-iliac joints; she was under his treatment for eighteen months or more. During that time his wife was very nervous, suffered great pain, and was compelled to wear a surgical brace constantly; and during that time she consulted a number of doctors without relief. Dr. Willis Campbell had a special iron brace made which was very rigid and which she wore with a special girdle or surgical garment. Dr. Henry Hill also examined her and had another brace made. Dr. Riggs testified that there had never been a day since the birth of her child when she could walk from her bedroom to the bath room or the dining room without pain unless she was wearing a brace; but that with a rigid brace she could walk around for short distances, but that she was unable to stoop or bend over, or even pull a window down; that she had shown but little, if any, improvement in three years, and that her condition was such that she could not follow any gainful occupation because she was compelled to lie on the bed for a substantial part of each day. He testified that the

X-rays showed that there was a definite separation of the left sacro-iliac joint and arthritic changes in the coccyx.

He testified that since the birth of this last child, then about three years old, he had been compelled to have two servants—a white nurse who lived in the house all the time and a colored cook who came in the morning and went home at night.

On his cross-examination he admitted that his wife could drive an automobile, that she drove a short distance to the grocery about twice a week, that she drove to town and went shopping at the store occasionally. His wife was a nurse before their marriage and had done some nursing before their marriage and did their cooking for some time after their marriage, but had been unable to do any nursing or cooking since the birth of the last child and had never been able to pick up or hold her youngest child in her arms.

Dr. Walker and Dr. Hardin testified to the same effect as Dr. Riggs with reference to the condition of Mrs. Riggs at the time they examined her, and Dr. Hardin testified that there was an injury to the coccyx bone or sacrum, and that if her condition remained the same as when he saw her he was of opinion that she was unable to follow any gainful occupation.

Mrs. Riggs testified at length and in detail as to her condition before and since the birth of her last child. She had been a trained nurse before her marriage and had been in good health up to the time of the birth of her third child; but at the birth of that child she had suffered an injury in the sacro-iliac, coccyx and sacro-lumbar regions which had caused her great pain and suffering since that time; that she had consulted numer-

ous doctors and surgeons and that the only relief she had been able to obtain was from the wearing of a rigid iron brace in connection with a special girdle or surgical garment; that she was unable to walk without the support of this brace except with great pain; that she tired easily and was compelled to spend a substantial part of each day in bed; that she was unable to bend over or to lift up anything that weighed more than two pounds, could not even pull a window down, and had never been able to lift up or hold her baby. She admits that with the use of the brace and girdle which she is compelled to wear she can walk about the house, walk to the nearby grocery, or drive her car and go shopping up town, but that she is easily fatigued and is unable to do any regular work or follow any gainful occupation.

The defendant offers no medical testimony to rebut the testimony of the complainant and the doctors who testified in her behalf, but bases its defense upon the ground that there are no objective symptoms of injury to the complainant's spine which would cause her to be totally disabled, and that the doctors who testified in her behalf based their opinions upon symptoms which were purely subjective, that is, upon the complainant's own statements of her pain and suffering; that she "enjoys poor health," and that her statements of her pain and suffering are greatly exaggerated, and that, at best, she is only partially disabled.

The chancellor took this view and held that if complainant was compelled to earn her living as a nurse, she would be totally disabled; but that since her duties were those of a housewife, and her husband was able to and did provide servants, she was able to perform the

duties required of her and was only partially disabled. He says:

"This court is of the opinion that under the facts involved in the instant case, if complainant were still engaged in the practice of the profession of a trained nurse, as she was at the time the policy was issued, she would be entitled to a recovery in the instant case, as being totally and permanently disabled within the meaning of her policy. On the other hand, as the facts actually exist at the present time and seem to have existed at the time her claim was first made on this policy, complainant was a housewife, and it is because of inability to perform her usual household duties that complainant is claiming the right of recovery at this time. On practically undisputed evidence in this cause, while complainant is forced to wear a tight and uncomfortable surgical garment, and to rest in a reclining position a substantial part of every day, she is, nevertheless, capable of performing most of her household duties, including such supplemental and additional activities as driving an automobile, doing her marketing at nearby grocery stores, entertaining guests, directing servants, which the record discloses her husband is financially able to and does provide, and otherwise, generally speaking, conducting her household in very much the same manner that any other housewife would.

"After a careful analysis of all the proof, this Court has reached the conclusion and finds as a fact that complainant is suffering from a partial disability, which is presumably permanent. Unfortunately for her, however, the policy on which this suit is predicated, contains no provision either for remission of premiums or for

payment of a monthly sum in the event of partial disability."

We are unable to concur with the chancellor in his reasoning on this question. The courts are not in entire harmony in the construction of these contracts, some applying the strict rule of interpretation, and others the liberal view. Our courts are aligned with the latter. As said in Principi v. Columbian Mutual Life Insurance Co., 169 Tenn. 276, 283, 84 S. W. (2d) 587, 589:

"With respect to this character of insurance contracts there are running through the authorities two rules of construction, one applying a strict, and the other a liberal, interpretation. This court is committed to the latter." (Citing cases.)

The leading case on this question in this state is Pacific Mutual Life Insurance Co. v. McCrary, 161 Tenn. 389, 32 S. W. (2d) 1052, 1053. The policy in that case defined the words "total disability" as—

"Disability caused by accidental bodily injury or disease which totally and permanently prevents the insured from performing any work or engaging in any occupation or profession for wages, compensation or profit."

In construing this language the court said:

"The phrase 'total disability' has a well-understood meaning in the law of insurance. It does not mean a state of absolute helplessness. The decisions, almost without conflict, define that condition as an inability to do the material acts necessary to the prosecution of insured's business or occupation (and substantially all the material acts) in (substantially) his usual or customary manner. . . . (Citing authorities.) One may still be described as totally disabled, although he is able at

intervals to perform certain acts in connection with the former occupation or calling that he pursued."

In that case the insured who was a physician was held to have been totally disabled although he was able to carry on the occupation of a farmer and cattle dealer, and also loaned money and sold land.

Other cases at the same effect are Burrell v. Provident Life & Accident Ins. Co., 162 Tenn. 672, 39 S. W. (2d) 1031, and Principi v. Columbian Mutual Life Ins. Co., supra, in which numerous authorities are cited.

We think the proof wholly fails to show any improvement in complainant's condition since her original application was granted, and that the preponderance of the evidence was against the chancellor's finding that she was no longer totally disabled. We therefore hold that the defendant was not warranted in discontinuing the payments for total and permanent disability under said policy.

The bill was filed on September 13, 1940, when five disability payments were overdue. On November 25, 1941, she obtained an order permitting her to amend the prayer of her bill so as to add to the prayer for a decree for $60 then alleged to be due, "or whatever amounts that may be due as of the date of the hearing." This amendment cannot avail her anything, as there is no pleading upon which a decree for payments accruing after the filing of the bill can be based. The amendment relates back to the filing of the original bill. Gibson, sec. 677. A supplemental bill is the proper mode of bringing before the court any new facts occurring after the filing of the original bill. Id., sec. 683. This question was before us in the case of Principi v. Columbian Mutual Life Ins. Co. at the January term 1937, when we held in an opinion

by Judge Anderson that Principi was entitled to recover for benefits accrued up to the filing of his bill, but was not entitled to recover for benefits accrued after the filing of the bill and up to the date of the final decree.

For the reasons stated the decree of the chancellor dismissing the complainant's bill will be reversed and a decree will be entered here adjudging that the defendant was not warranted in discontinuing the disability payments accruing under said policy after March 30, 1940, and entering a decree in favor of complainant for the amount of the five payments of $10 each maturing on the 30th day of the months of April, May, June, July and August, 1940, with interest.

The costs of the cause will be adjudged against the defendant.

Decree accordingly.

Anderson, P. J., and Adams, S. J., concur.